UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTONIO RUBIO-LEON, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>FRESH HARVEST, INC., et al.,<br><br>　　　　Defendants. | Case No. 24-cv-03375-EKL<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION**<br><br>Re: Dkt. No. 45 |

Plaintiffs, four seasonal workers, allege that Defendants violated their employment contracts and federal- and state-law labor provisions that provide for minimum wages, overtime pay, and reimbursement of business expenses. *See* Am. Compl., ECF No. 15 ("Compl."). Defendants move to compel arbitration of all claims except for Plaintiffs' representative Private Attorneys General Act ("PAGA") claim, which Defendants move to dismiss or stay. Mot. to Compel Arbitration, ECF No. ("Mot."). The Court carefully reviewed the parties' briefs and heard oral argument. For the following reasons, the Court GRANTS the motion to compel arbitration as to the non-PAGA claims, DISMISSES Plaintiffs' claims without prejudice to the extent they are brought as a class or collective action, and STAYS the action while arbitration is pending.

**I.    BACKGROUND**

Plaintiffs Antonio Rubio-Leon, Angel De Jesus Rocha-Rivera, Diego Martinez-Jimenez, and Gerardo Ledesma-Delgado are seasonal workers who were hired by one or more of the Defendants. Compl. ¶¶ 8-11. Defendants are Fresh Harvest, Inc. ("Fresh Harvest"), Farm Labor Association for Growers, Inc. ("FLAG"), and SMD Logistics, Inc. ("SMD"). *Id*. ¶¶ 15-31. Plaintiffs allege that Fresh Harvest is a farm labor contractor. *Id*. ¶ 15. Plaintiffs allege that FLAG engages in farm labor contracting activities as an alter ego of Fresh Harvest. *Id*. ¶¶ 23-24.

Finally, Plaintiffs allege that SMD "is the trucking arm" of Fresh Harvest. *Id*. ¶ 27.

Plaintiffs allege that they worked for Defendants as seasonal workers pursuant to H-2A visas. The H-2A visa program allows certain agricultural employers to bring foreign nationals into the United States if there are not enough U.S. workers to perform the job, and if such employment will not adversely affect the wages and working conditions of similarly-employed U.S. workers. *Id*. ¶ 40. An employer seeking H-2A workers must file an application with the U.S. Department of Labor, which includes a "job order" containing the terms of employment offered to both H-2A and U.S. workers. *Id*. ¶¶ 41-43.

The parties dispute the nature of Plaintiffs' work. Plaintiffs allege that they were "H-2A workers brought into the United States by Defendants as truck drivers." *Id*. ¶ 3; *see also id.* ¶¶ 13, 69. Plaintiffs allege that they worked in "Heavy and Tractor-Trailer Truck Driver positions operating tractor-trailers on roads and highways hauling harvested vegetables to Defendants' clients' cooler and produce-packing locations." *Id*. ¶ 58. Plaintiffs claim that Defendants "sought to avoid paying the prevailing wage to truck drivers by including [Plaintiffs] within H-2A agricultural job orders for field labor positions." *Id.* ¶ 57. This issue, and evidence submitted by the parties, is discussed in greater detail below. *See infra* Section III.A.

Each Plaintiff signed an arbitration agreement, which provides that: "[a]ny and all disputes, controversies or claims . . . arising out of or relating to this employment handbook, your employment or the termination of your employment may be settled by binding arbitration before an impartial arbitrator, unless otherwise prohibited by applicable law." Optional Arbitration Agreement at 2, ECF No. 45-17.[1] The arbitration provision "provide[s] the exclusive remedy and, by reading and signing this Agreement, each [Plaintiff] expressly waive[d] any right they might have to seek redress in any other forum, including a trial by jury." *Id.* The arbitration agreement also provides that signatories "are expressly precluded from filing or participating in any joint, class, representative or collective claims addressing their wages, hours or other terms or conditions

---

[1] Three Plaintiffs signed identical versions of the arbitration agreement. *See* ECF Nos. 45-17 (Rocha-Rivera), 45-19 (Rubio-Leon), and 45-21 (Martinez-Jimenez). The other Plaintiff signed a substantially similar version of the arbitration agreement, ECF No. 45-15 (Ledesma-Delgado), which contains one immaterial change noted below. *See infra* n.2.

of their employment against the employer in any forum, whether arbitral or judicial. *This waiver includes PAGA claims to the extent permitted by law*."[2] *Id.* (emphasis added).

Plaintiffs assert ten claims relating to wage-and-hour violations under state and federal law. Specifically, Plaintiffs assert claims for: (1) Violation of the Fair Labor Standards Act (29 U.S.C. §§ 206 *et seq.*); (2) Failure to Pay California Minimum Wage (Cal. Lab. Code § 1194); (3) Failure to Pay Overtime Wages (Cal. Lab. Code § 1194); (4) Failure to Reimburse Business Expenses (Cal. Lab. Code § 2802); (5) Breach of Employment Contract; (6) Failure to Furnish Accurate Itemized Wage Statements (Cal. Lab. Code § 226); (7) Violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.*); (8) Waiting Time Penalties for Failure to Pay All Wages Due (Cal. Lab. Code § 203); (9) Civil Penalties under the Private Attorneys General Act (Cal. Lab. Code § 2698); and (10) Retaliation (Cal. Lab. Code § 98.6).

## II.   EVIDENTIARY OBJECTIONS

Defendants submitted 54 pages of evidentiary objections as attachments to their reply brief. Evid. Obj., ECF Nos. 51-1, 51-2, 51-3, 51-4. This extensive filing violates Civil Local Rule 7-3(c), which provides that "[a]ny evidentiary and procedural objections to the opposition must be contained within the reply brief or memorandum." Through this maneuver, Defendants essentially quadrupled the length of their reply brief. *See* Civil L.R. 7-3(c) ("[T]he reply brief or memorandum may not exceed 15 pages of text."). Defendants offered no reason for violating Local Rule 7-3(c). Accordingly, Defendants' evidentiary objections are STRICKEN for failure to comply with the Local Rules. However, the Court independently assessed evidentiary issues to the extent they are relevant to the Court's ruling on the motion to compel arbitration. *See Hennighan v. Insphere Ins. Sols., Inc.*, 38 F. Supp. 3d 1083, 1094-95 (N.D. Cal. 2014); *see also*

---

[2] The version of the arbitration agreement executed by Ledesma-Delgado includes different language regarding the scope of the waiver of representative claims. Instead of waiving PAGA claims "as permitted by law," Ledesma-Delgado's arbitration agreement excludes PAGA claims from the waiver of representative actions. *See* ECF No. 45-15 at 3. This difference is immaterial because the waiver of representative PAGA claims in the other version of the arbitration agreement is not "permitted" under California law. *Adolph v. Uber Techs., Inc.*, 14 Cal. 5th 1104, 1118 (2023) (recognizing that an arbitration agreement cannot require a plaintiff to waive representative PAGA claims). Although Plaintiffs did not address this issue in their opposition brief, the legal effect of the waiver provision is the same under either version of the arbitration agreement: Plaintiffs did not waive their representative PAGA claims.

*Hahn v. Select Portfolio Serv., Inc.*, 424 F. Supp. 3d 614, 637 (N.D. Cal. 2020).

In ruling on a motion to compel arbitration, courts apply the "summary judgment standard outlined" in Rule 56. *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021). Therefore, the focus is not "on the admissibility of the evidence's form," but rather "on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). At this stage, "a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rule of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001). An affidavit or declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Here, Plaintiffs submitted declarations based on their personal knowledge, attesting to basic facts about the nature of their work for Defendants. These declarations are supported by documents, including pay stubs and H-2A visa employee status forms. Defendants lodged numerous objections to this evidence, many of which are misplaced at this stage of the proceedings. The Court discusses a few illustrative examples.

First, Defendants object to Plaintiff Ledesma-Delgado's statement that he worked as a "truck driver," arguing that it lacks foundation and is irrelevant, hearsay, an improper legal conclusion, and improper opinion testimony. *See* Ledesma-Delgado Evid. Obj. Nos. 1, 6. These objections are boilerplate and inapposite. The Court has no reason to doubt that a worker has foundation to testify to the nature of his own work. Moreover, the statement is directly relevant to the primary issue raised on this motion: Whether Plaintiffs belong to a class of workers engaged in interstate commerce, based on the work they actually performed. *See infra* Section III.A. The Court reads this straightforward statement as factual, not as a conclusion or opinion about the legal classification of Plaintiffs' work.

Second, Defendants also object to the supporting documents as hearsay and lacking authentication. *See, e.g.*, Ledesma-Delgado Evid. Obj. Nos. 10, 12. But at this stage, the Court "may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." *JL*

4

*Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016). Here, Defendants' hearsay objections are based on the evidence's current form, and they offer no reason why the evidence could not be provided in an admissible form later. Similarly, Defendants do not claim that the pay stubs and H-2A employee status forms are *inauthentic*. In the absence of any true concern about the documents' authenticity, these objections are not well taken.[3]

In sum, the Court has considered Defendants' evidentiary objections to the extent they are relevant to this Order. In doing so, the Court relies solely on evidence that may be appropriately considered at this stage of the proceedings.

## III. DISCUSSION

Defendants move: (1) to compel Plaintiffs "to arbitrate all claims alleged in this action on an individual basis," (2) to "dismiss[] the putative class claims alleged pursuant to an express class action waiver," and (3) to dismiss the representative PAGA claims or to stay them pending arbitration. Mot. at 2. Plaintiffs oppose arbitration, but did not address the other relief Defendants request. *See* Opp., ECF No. 48. The Court discusses these issues in turn.

### A. The Court Will Compel Arbitration.

The Federal Arbitration Act ("FAA") governs the enforcement of written arbitration agreements implicating interstate commerce. 9 U.S.C. §§ 1 *et seq.*; *see Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001) (holding that the FAA extends to employment contracts, except for "contracts of employment of transportation workers"). In deciding whether to compel arbitration, a court must determine: "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). Plaintiffs do not dispute that these two threshold requirements are satisfied. Plaintiffs acknowledge that they signed optional arbitration agreements. ECF Nos. 45-15, 45-17, 45-19, 45-21 (English language translations of signed arbitration agreements). And Plaintiffs do not contest that the arbitration agreements cover all claims asserted in this action,

---

[3] Defendants also object to documents other than the pay stubs and H-2A employee status forms, including Facebook advertisements and photographs. *E.g.*, Ledesma-Delgado Evid. Obj. Nos. 4, 8. The Court did not rely on these documents, thus Defendants' objections are moot.

1  except for the representative PAGA claim, because the claims arise out of or relate to their
2  employment.  Optional Arbitration Agreement at 2.
3        Plaintiffs oppose arbitration on a different basis:  They contend that the arbitration
4  provision is exempt from the FAA because Plaintiffs are transportation workers engaged in
5  foreign or interstate commerce.  *See* 9 U.S.C. § 1 (exempting from the FAA's scope "any contracts
6  of employment of seamen, railroad employees, or any other class of workers engaged in foreign or
7  interstate commerce").  "As the party opposing arbitration, plaintiffs bear the burden of
8  establishing that the exemption applies."  *Fli-lo Falcon, LLC v. Amazon.com, Inc*., 97 F.4th 1190,
9  1194 (9th Cir. 2024).  The Court applies the evidentiary standards and burdens that apply to
10 summary judgment motions.  *Hansen*, 1 F.4th at 670; *see also Noel v. Roblox Corporation*,
11 No. 24-cv-00963-JSC, 2024 WL 3747454, at *5 (N.D. Cal. Aug. 8, 2024).  Therefore, because
12 Plaintiffs bear the ultimate burden of proof as to the transportation worker exemption, at this stage,
13 Plaintiffs must present at least a genuine dispute of material fact that the exemption applies.  Fed.
14 R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  If Plaintiffs fail to present
15 a genuine dispute of material fact that the exemption applies, the Court must compel arbitration.
16       The Court employs a two-step analysis to determine whether the transportation worker
17 exemption applies.  At step one, the Court "defin[es] the relevant 'class of workers' to which"
18 Plaintiffs belong.  *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022).  In defining the class of
19 workers, the Court focuses on "the actual work that the members of the class, as a whole, typically
20 carry out," not on what the employer "does generally."  *Id*. at 456.  At step two, the Court
21 "determine[s] whether that class of workers is 'engaged in foreign or interstate commerce.'"  *Id*.
22 A class of workers is engaged in foreign or interstate commerce if the workers play a "direct and
23 necessary role in the free flow of goods across borders."  *Id*. at 458.  In other words, the workers
24 must be "actively 'engaged in transportation' of those goods across borders via the channels of
25 foreign or interstate commerce."  *Id.*; *see also Ortiz v. Randstad Inhouse Servs., LLC*, 95 F.4th
26 1152, 1159-60 (9th Cir. 2024) ("[A]n employee's relationship to the movement of goods must be
27 sufficiently close enough to conclude that his work plays a tangible and meaningful role in their
28 progress through the channels of interstate commerce.").  Courts must give the transportation

worker exemption a "narrow construction."  *Circuit City Stores*, 532 U.S. at 118.

### 1.  Step one:  Defining the class of workers

Here, there is no genuine dispute of fact that Plaintiffs belong to a class of workers that haul and truck a variety of agricultural products directly from a farmer's fields to a cooling facility at the farm's processing plant.

This class definition is supported by Plaintiffs' signed declarations and documentary evidence, including Plaintiffs' pay stubs and records reflecting their H-2A visa employment status.  For example, in his declaration, Rocha-Rivera states that his job "was always as a truck driver" and that he "never held any other position" when he worked for Defendants.  Rocha-Rivera Decl. at 2, ECF No. 48-3.  Consistent with this statement, his pay stub reflects that he was paid for work "hauling commodity," "mov[ing] material," as a "[t]ruck driver," and for "[g]eneral ([t]rucking)."  Rocha-Rivera Pay Stub, ECF No. 48-6.  Finally, his notice of termination as an H-2A worker states:  "Classification: Truck Driver."  Rocha-Rivera H2A Employee Status Form, ECF No. 48-9.  Ledesma-Delgado and Rubio-Leon submitted similar evidence reflecting their work as truck drivers.[4]

Plaintiffs also submitted two H-2A visa job clearance orders, which detail the terms of work for which Plaintiffs were brought into the United States.  *See* ECF Nos. 48-1 ("2021 Job Order"), 48-2 ("2023 Job Order").  The job orders reflect the following job title: "Vegetable/Harvest Workers, Haulers/Truck Drivers."  2021 Job Order at 1.  The job orders describe the harvesting work required for numerous types of crops.  For example, for onions, workers must "top" onions – that is, they must use shears to remove onion bulb roots and stems – and then place the onion bulbs in a bucket, which is then dumped into a bin.  *Id.* at 24.  The truck driving and hauling work involves transporting the bins and cartons of freshly harvested

---

[4] *See* Ledesma-Delgado Decl. at 1, ECF No. 48-10 ("My position was always as a truck driver.  I held no other positions in these companies.  I did not pick any vegetables nor did I plant anything.  My job was to be a truck driver."); Ledesma-Delgado Pay Stub, ECF No. 48-13; Ledesma-Delgado H2A Employee Status Form, ECF No. 48-14 ("Classification:  Truck Driver"); Rubio-Leon Decl. at 1, ECF No. 48-15 (stating that he "worked as a truck driver"); Rubio-Leon H2A Employee Status Form, ECF No. 48-19 ("Classification:  Truck Driver").  Plaintiff Martinez-Jimenez did not submit a declaration or other evidence specific to the work he performed, but relies on the H-2A visa job clearance orders discussed above.

7

vegetables "directly from the farmer's fields to the [farm's] processing plant" – specifically, the "plant's refrigeration storage site – cooling facility." *Id.* at 28; *see also* 2023 Job Order at 48 (similar). The job orders list the specific farm locations at which Defendants placed Plaintiffs and other H-2A workers. These farms are associated with Defendants' customers, including Organic Girl Ranches, Taylor Farms, and Fresh Express. 2023 Job Order at 11-42.

Based on this evidence, Plaintiffs belong to a class of workers that haul and truck a variety of agricultural products directly from a farmer's fields to a cooling facility at the farm's processing plant. Defendants do not offer any evidence that contradicts the specific facts supported by Plaintiffs' declarations, pay stubs, or H-2A employment records. Instead, Defendants offer a declaration from Matt Scaroni, one of their executives, which states without further elaboration that Plaintiffs "were hired . . . as farm workers." Scaroni Decl. ¶ 4, ECF No. 45-22. This declaration does not address the work that Plaintiffs *actually performed*, and thus it does not contradict any of Plaintiffs' evidence detailing their work as truck drivers and haulers of agricultural products on farms. The Scaroni Declaration also does not create a genuine dispute of material fact under the applicable legal standard. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For purposes of the transportation worker exemption, the class of workers is defined by the "actual work that the members of the class, as a whole, typically carry out." *Saxon*, 596 U.S. at 456. Whether Defendants technically classified Plaintiffs as "farm workers" is not dispositive.

Defendants further argue that Plaintiffs are not transportation workers because the hauling and truck driving work was incidental to harvesting and farming work. Reply at 6, ECF No. 6. Specifically, the job orders state that "[t]he hauling/truck driving activities are not a separate job. Truck driving activities constitute less than 10% of the total duties performed." 2021 Job Order at 27; *see also* 2023 Job Order at 48 (same). However, at most, these documents reflect that Defendants *intended* for the hauling and truck driving work to be a relatively small portion of the responsibilities of H-2A workers. By contrast, Plaintiffs' evidence reflects that Plaintiffs *actually* worked predominantly or exclusively as truck drivers. Additionally, even if Plaintiffs had performed harvesting and farming work as well, it would not detract from the fact that Plaintiffs

8

"frequently" worked as haulers and truck drivers. *See Saxon*, 596 U.S. at 453, 463 (holding that worker who supervised cargo loading, but also "frequently" loaded and unloaded cargo on and off airplanes, belonged to a class of employees exempt from the FAA).

The Court next considers whether this class of workers is engaged in foreign or interstate commerce.

### 2. Step two: Determining whether the class of workers is engaged in interstate commerce

At step two, the Court analyzes whether the class of workers plays a "direct and necessary role in the free flow of goods across borders." *Id*. at 458. To satisfy this requirement, workers do not need to physically transport goods across borders, *id*. at 461, and there is no evidence that Plaintiffs do so. However, Plaintiffs must at least play "a tangible and meaningful role" in the progress of goods "through the channels of interstate commerce." *Ortiz*, 95 F.4th at 1159-60. The transportation worker exemption becomes more attenuated as workers carry out duties "further removed from the channels of interstate commerce or the actual crossing of borders." *Saxon*, 596 U.S. at 457 n.2.

Here, Plaintiffs have not met their burden to produce evidence showing that the class of workers plays a tangible and meaningful role in the progress of goods through the channels of interstate commerce. The evidence summarized above reflects that the workers move fresh agricultural products directly from the fields in which they are harvested to a cooling facility at the farm's processing plant. *See supra* Section III.A.1. The job orders state, without further elaboration, that a cooling facility is an "initial point of distribution." 2021 Job Order at 28; 2023 Job Order at 48. However, there is no evidence reflecting what happens to the goods after they reach the cooling facility. Indeed, there is no evidence that the agricultural products *ever* moved in interstate commerce, let alone that the class of workers played a meaningful role in that journey.

Plaintiffs cite to the websites of certain farms where Plaintiffs allegedly worked to support the general proposition that these farms have multi-state or regional operations. For example, Taylor Farms states that "[a]s North America's largest producer of fresh foods, [it] cultivate[s] extraordinary produce that will enrich our tables and nourish our communities for generations to

9

come." Taylor Farms, *Vegetable Facts*, https://www.taylorfarms.com/vegetable-facts/ [https://perma.cc/4ZKK-66WF]. Fresh Express touts that it was "the very first to successfully package and nationally distribute fresh-cut, ready-to-eat bagged salad." Fresh Express, *Our History*, https://www.freshexpress.com/our-history [https://perma.cc/RT9G-AM8L]. And Southern Colorado Farms states that it "focus[es] on key specialty crops for regional eastern markets." Southern Colorado Farms, *About Us*, https://jvsmithcompanies.com/southern-colorado-farms.html [https://perma.cc/V3SE-2NTT]. But the focus at step two is on the workers' "relationship with the flow of goods and the extent to which [the workers'] role enables [the goods] to flow in interstate commerce." *Ortiz*, 95 F.4th at 1164. The fact that some of these farms might have interstate operations does not address "how, when, and where goods move through the supply chain," *id.*, or how this class of workers plays a meaningful role in that movement.[5]

Plaintiffs rely on cases involving "last leg" delivery drivers, but those cases are distinguishable because there was a nexus between the class of workers and the progress of goods through the channels of interstate commerce. For example, in *Rittmann v. Amazon.com, Inc.*, Amazon Flex delivery drivers were found to be engaged in interstate commerce because they "pick up packages that have been distributed to Amazon warehouses, certainly across state lines, and transport them for the last leg of the shipment to their destination." 971 F.3d 904, 915 (9th Cir. 2020). Critically, the Amazon packages were moving through interstate commerce before the drivers handled them, and they "remain in the stream of interstate commerce until they are delivered." *Id.* In *Carmona v. Domino's Pizza, LLC*, drivers that transport pizza ingredients from a supply chain center to pizza franchisees were found to be engaged in interstate commerce because the goods they transport are "inevitably destined from the outset of" their journey to customers located across state lines. 73 F.4th 1135, 1138 (9th Cir. 2023). Here, unlike in *Rittmann* and *Carmona*, there is no evidence that the agricultural products ever moved in interstate

---

[5] The Supreme Court has also instructed courts to consider the workers' specific role, not the nature of the employer's business generally. *Saxon*, 596 U.S. at 456, 458-60; *Bissonnette v. Lepage Bakeries Park St., LLC*, 601 U.S. 246, 253-54 (2024). For this additional reason, the Court cannot infer that the class of workers plays a role in interstate commerce solely because the farms here may have interstate operations.

1  commerce. There is only evidence that the products moved from fields to a processing plant.
2  Consequently, it is unclear whether this class of workers has any role – let alone a direct and
3  necessary role – in the movement of the goods through the channels of interstate commerce.[6]

4  Plaintiffs also cite to *Ortiz*, in which warehouse workers were found to be engaged in
5  interstate commerce because "the relevant goods were still moving in interstate commerce when
6  the employee interacted with them, and each employee played a necessary part in facilitating their
7  continued movement." *Ortiz*, 95 F.4th at 1157-58, 1161-62. The workers handled goods "near
8  the very heart of their supply chain." *Id.* at 1162; *see also Nair v. Medline Indus., LP*, No. 23-
9  15582, 2024 WL 4144070, at *1 (9th Cir. Sept. 11, 2024) (holding that shipping dock workers
10 were engaged in interstate commerce because they "frequently package, move, load, unload, and
11 ship medical supplies at [defendant's] warehouses for delivery to interstate customers"). Here, by
12 contrast, the class of workers in this case does not work near the heart of the supply chain. There
13 is no evidence regarding what happens to the goods after they reach the processing plant –
14 including whether the goods are altered (*e.g.*, transformed into packaged salads, as advertised on
15 the websites cited above), or whether they are transported locally or interstate. *Cf. Carmona*, 73
16 F.4th at 1138 (finding that goods remained in interstate commerce because they were "unaltered
17 from the time they arrive in [the warehouse] until they are delivered," and were not "transformed .
18 . . into meals").

19 In sum, Plaintiffs have not met their burden at step two to produce evidence regarding the
20 workers' "relationship to the movement of goods" in interstate commerce. *Ortiz*, 95 F.4th at 1160.
21 Plaintiffs perform purely intrastate work, transporting agricultural products from fields to a
22 cooling facility at the farm's processing plant. There is no evidence in the record regarding the

---

[6] If the goods did move through the channels of interstate commerce, the class of workers in this case could be viewed as a "first leg" parallel to the "last leg" delivery drivers in *Rittmann*. Conceptually, the Court sees no reason why the outcome under *Rittmann* would be different just because the work performed is at the beginning, rather than at the end, of the interstate journey. For example, in *Saxon*, the class of workers performed work both at the beginning and the end of the interstate journey by loading and unloading cargo on airplanes. *Saxon*, 596 U.S. at 453. However, there is a distinction of proof. When a class of workers handles the "last leg" of an interstate delivery, it is evident that the goods are moving in interstate commerce already. Here, by contrast, it is not self-evident that the goods will ever move through interstate commerce.

11

1    relationship between this work and the potential movement of the goods in interstate commerce.
2    *See id.* Accordingly, because the transportation worker exemption does not apply, Defendants'
3    motion to compel arbitration is GRANTED.[7]

### B. The Putative Class and Collective Action Claims are Dismissed Without Prejudice.

Defendants move to dismiss Plaintiffs' "putative class claims" pursuant to the express class and collective action waiver in the arbitration agreements. Mot. at 2. Defendants are correct that the arbitration agreements preclude Plaintiffs from "filing or participating in any joint, class, representative or collective claims." Optional Arbitration Agreement at 2. Plaintiffs do not contest the validity of this waiver under federal law.[8] *See Capriole v. Uber Techs.*, 7 F.4th 854, 869 (9th Cir. 2021) ("[A]rbitration agreements may contain waivers of the class action mechanism and require the parties to pursue their claims individually." (citing *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018)). Accordingly, the Court gives effect to the waiver provision in the arbitration agreements and dismisses Plaintiffs' putative class and collective claims without prejudice to the rights of putative absent class members.

---

[7] The arbitration agreements are between Defendant FLAG and each Plaintiff. Defendants argued, and Plaintiffs did not contest, that all Defendants may invoke the arbitration provisions based on equitable estoppel under California law. Relevant here, the doctrine of equitable estoppel permits a nonsignatory to an arbitration agreement to enforce it when the plaintiff "alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and 'the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement.'" *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128-29 (9th Cir. 2013) (quoting *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209, 219, 221 (2009)). The Court agrees that equitable estoppel applies here because Plaintiffs assert that all Defendants acted together in violating the terms of their employment contracts, which include the arbitration agreement. *See* Compl. ¶¶ 23, 57.

[8] Plaintiffs argue that class action waivers are invalid under the California Arbitration Act ("CAA"). Opp. at 7. This argument was raised only to the extent that Defendants sought to compel arbitration under the CAA. Because the Court grants Defendants' motion to compel arbitration under the FAA, the validity of class action waivers under the CAA is not at issue. *See AT&T Mobility v. Concepcion*, 563 U.S. 333, 351-52 (2011).

### C. A Stay Is Appropriate.

Defendants seek to stay this action pending resolution of Plaintiffs' individual arbitrations.[9] Mot. at 2. "Under 9 U.S.C. § 3, a district court must stay proceedings for claims and issues 'referable to arbitration' pending resolution of the arbitration." *Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 832 (9th Cir. 2019). Additionally, a "district court has inherent power to control the disposition of the causes on its docket in a manner which will promote economy of time and effort for itself, for counsel, and for litigants." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962). In exercising its discretion to grant or deny a stay of non-arbitrable issues, the Court must balance competing interests, including "the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law." *Id.*; *see also Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863-64 (9th Cir. 1979) ("A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case."); *Synopsys, Inc. v. Siemens Indus. Software Inc.*, No. 20-cv-04151-WHO, 2021 WL 11679003, at *4 (N.D. Cal. Sept. 9, 2021) ("[I]t is well-established and undisputed that courts have discretion to stay non-arbitrable issues.").

The Court must refer Plaintiffs' claims, except for Plaintiffs' representative PAGA claim (ninth claim for relief), to arbitration. *See Blair*, 928 F.3d at 832. However, Plaintiffs' representative PAGA claim is excluded from the relevant arbitration agreements. *See supra* n.2. Thus, the Court must decide whether to stay this action in its entirety, or to proceed with litigation of the representative PAGA claim while every other claim is arbitrated.

Here, after balancing the competing interests, the Court concludes that a discretionary stay would conserve judicial and party resources given the substantial overlap between the arbitrable claims and the non-arbitrable PAGA claim. "[S]taying the entire action is more judicially efficient

---

[9] Defendants alternatively ask the Court to dismiss the representative PAGA claim. Mot. at 8. But under these circumstances, a stay – rather than dismissal – is required. *Smith v. Spizzirri*, 601 U.S. 472, 475-77 (2024).

because of the possibility of substantially simplifying the issues and the risk of wasting judicial resources if the entire action is not stayed." *Synopsys*, 2021 WL 11679003, at *5. In this case, there is substantial overlap between the issues that must be decided to resolve the arbitrable claims and the representative PAGA claim. Plaintiffs' claims generally turn on whether Defendants violated wage, overtime, and reimbursement provisions of the California Labor Code. *See* Compl. ¶¶ 129-150, 171-181, 192-201. Plaintiffs' representative PAGA claim challenges precisely the same conduct. *Id.* ¶ 209. Thus, staying the action in its entirety until arbitration concludes will promote orderly and efficient resolution of all issues. A stay will also protect Defendants from the hardship and inequity of being required to proceed with litigation and arbitration on substantially the same issues in two forums, which would be inconsistent with the purposes of the FAA.

The only factor that may counsel against a stay is the potential harm to Plaintiffs. However, Plaintiffs did not identify any prejudice that might result from a stay. The Court recognizes that strong public policy interests underlying PAGA may counsel against a stay in some cases, but here, a stay at this time is consistent with public policy. *See Adolph*, 14 Cal. 5th at 1123-24. In *Adolph*, the Supreme Court of California held that PAGA claims may be bifurcated into individual claims subject to arbitration, and representative claims subject to litigation in court. 14 Cal. 5th at 1123. The defendant in that case complained that bifurcation would allow a plaintiff to re-litigate issues in court that had been decided by the arbitrator. *Id.* The court explained that the re-litigation problem can be avoided by staying the representative PAGA claims in the court's discretion. *Id.* After the arbitration concludes, the parties may ask the court to confirm the arbitrator's determination as to the individual PAGA claim so that it is "binding on the court." *Id.* at 1124. The Court agrees that this approach facilitates orderly enforcement of the Labor Code and does not undermine any associated public policy.

In sum, a stay of this action will promote judicial economy and will avoid the hardship and inefficiency of dual-track litigation and arbitration of overlapping issues. Although Plaintiffs fail to articulate any harm that outweighs these considerations, the Court recognizes that the equities and interests may weigh differently as time passes if there is undue delay in the arbitration process. Thus, the Court will continue to monitor the status of the arbitration proceeding.

14

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

(1) The Court GRANTS Defendants' motion to compel arbitration as to all claims, except for Plaintiffs' representative PAGA claim.

(2) The Court GRANTS Defendants' motion to dismiss Plaintiffs' claims to the extent they are brought as a class or collective action, pursuant to the valid waiver of such claims included in the arbitration agreement. This includes Plaintiffs' first through eighth claims for relief, which are brought as putative class or collective action claims. Compl. ¶¶ 114, 129, 135, 143, 154, 173, 182, 194. Dismissal is without prejudice to the rights of putative class members,

(3) Additionally, the Court GRANTS Defendants' motion to stay this action in its entirety until arbitration concludes. The parties shall file an initial joint status report regarding arbitration by March 16, 2026, and updated joint status reports every six months thereafter. If the parties resolve the claims at issue, through arbitration or otherwise, the parties shall notify the Court within seven days of the resolution.

(4) In light of the stay, all other case deadlines are VACATED.

**IT IS SO ORDERED.**

Dated: September 16, 2025

Eumi K. Lee
United States District Judge